CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 4, 2024**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **JOHN WAYNE PETROS,** | § | **Case No. 23-32905-MVL11** |
| | § | |
| **Debtor.** | § | |

**ORDER DENYING MOTION TO DISMISS**
**AND CONVERTING THIS CASE TO CHAPTER 7**

Before the Court is the *Motion to Dismiss Bankruptcy Case* (the **"Motion"**) filed by Kevin Miller (**"Mr. Miller"** or the **"Movant"**) [ECF Nos. 97 and 99]. The Debtor, John Wayne Petros, filed a Response on July 10, 2024, at ECF No. 113, and the Movant filed his Reply on July 17, 2024, at ECF No. 116. A hearing was held on July 22, 2024 (the **"Hearing"**), with closing arguments occurring on July 31, 2024. The Court also allowed post-hearing briefing with specific

regard to the Debtor's refusal to attend to the Hearing.[1] The following constitutes the Court's ruling with respect to the Motion.

## I. INTRODUCTION.

In the Sixteenth Century, the English playwright John Heywood published a collection of popular proverbs including the following: "there is no fyre without some smoke."[2] The popular idiom has thrived over the past half millennium. The urban poet Dr. Dre parroted the saying in his verse on Eminem's "Old Time's Sake": "where there's smoke, there's fire. Where there's fire, there's flames."[3] In the case at hand, the Court is left with not only the impression that there is a fire, but that the Debtor is "standing next to a burnt down house … with a can full of gas and a hand full of matches."[4]

The Debtor in this case, Mr. Petros, has been accused of filing this bankruptcy case in bad faith. The Movant argues that the Court should dismiss the case. Although the Debtor generally denies the allegations of bad faith, Mr. Petros failed to appear at the Hearing on the Motion to Dismiss, despite having previously represented to the Court that he would be available to attend the Hearing on that specific day. Thus, Mr. Petros rested the survival of his case on a gamble: whether the Movant would meet his initial burden to show cause to dismiss the Debtor's case for bad faith by a preponderance of the evidence. The Debtor's gamble was equal parts strategic and unwise.

Nevertheless, as the Court will discuss more fully below, the Debtor's twisted web of artifice seemingly involved at times the Movant's complicity, at least facially. Like the Debtor,

[1] See ECF Nos. 145 and 146.
[2] *John Heywood, "Proverbes"* (1546), Part ii, Chap. v.
[3] EMINEM FEAT. DR. DRE, *Old Time's Sake*, *on* RELAPSE (Aftermath Entm't 2009).
[4] DR. DRE FEAT. EMINEM, *Forgot About Dre*, *on* 2001 (Aftermath Entm't 1999).

the Movant also did not see fit to testify at the Hearing to explain obvious questions such as how and why the Debtor repeatedly obtained deeds to properties from the Movant for little, if any, consideration. The Court has determined therefore, rather than dismiss the case, there is just cause to convert the instant bankruptcy case to chapter 7.[5]

## II. JURISDICTION.

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in this district pursuant to 28 U.S.C. § 1408. The Court has authority to adjudicate this matter pursuant to the United States District Court for the Northern District of Texas Miscellaneous Order No. 33.

## III. FACTUAL AND PROCEDURAL BACKGROUND.

On December 6, 2023 (the **"Petition Date"**), the Debtor commenced this case by filing a bankruptcy petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code. The Subchapter V trustee has not taken an active role in this proceeding.

The factual background in this case is murkier than a bayou after a good rain. Both the Movant and the Debtor elected not to testify for reasons that flatly bewilder the Court. Accordingly, the chain of events that led to the Debtor's ownership of numerous pieces of real property is by no means concrete. What appears uncontested is that Mr. Miller was the step-son of Delmo Johnson, Jr. (**"Johnson"**). Pursuant to the Last Will and Testament of Delmo Johnson, Jr. dated October 29, 2006, Johnson bequeathed 99% of his estate to Kevin Miller (**"Johnson Estate"**). The Johnson Estate included the following properties at issue in this bankruptcy (collectively, the **"Inherited Properties"**):

a. 15790 Dooley Road, Addison, Texas 75001 (the **"Dooley Road Property"**)

[5] The Court notes that Debtor's counsel specifically requested at the Hearing that the Court convert the case rather than dismiss it if the Court were inclined to grant the Motion.

Legal Description: Addison Airport Industrial District, Block A, Lot 1, Dallas County, Texas;

b. 1340 Manufacturing Street, Dallas, Texas 75207 (the **"1340 Manufacturing Street Property"**)
Legal Description: Trinity Industrial District 11, Block 31/7891, Lot 4, Dallas County, Texas;

c. 1300 Manufacturing Street, Dallas, Texas 75207 (the **"1300 Manufacturing Street Property"**)
Legal Description: Trinity Industrial District Installment No. 11, Block 31/7891, Lot 3, Dallas County, Texas.

d. 1901 Rock Island Street, Dallas, Texas 75207 (the **"1901 Rock Island Property"**)
Legal Description: Industrial Improvement Project, Block 73/7342, Lot 13, Dallas County, Texas;

e. 1815 Rock Island Street, Dallas, Texas 75207 (the **"1815 Rock Island Property"**)
Legal Description: Industrial Improvement Project, Block 73/7342, Lot 12, Dallas County, Texas;

f. 15770 Midway Road, Addison, Texas 75001 (the **"Midway Road Property"**)
Legal Description: Unit 3, Building A, 15770 Midway Road Condominiums, Dallas County, Texas

g. 1579 Swanson Landing Rd., Karnack, TX 75661 (the **"Swanson Property"**)
Legal Description: 113 B S Brooks, Harrison County, Texas; and

h. 10643 Saint Lazare Drive, Dallas, Texas 75229 (the **"Saint Lazare Property"**)
Legal Description: Les Jardins Addition 1, Block 3/5535, Lot 7, Dallas County, Texas.

Mr. Miller later appointed the Debtor as "replacement executor" of the Johnson Estate on March 9, 2020. At some point, Mr. Miller transferred the Inherited Properties back to the Johnson Estate under the Debtor's control. From there the Inherited Properties were transferred randomly and repeatedly to various entities associated with the Debtor or to the Debtor himself, often with the assistance of his non-debtor spouse, Gardine Froman (**"Ms. Froman"**), who is a licensed real estate agent and notary, and former family friend of Mr. Miller. According to at least two witnesses, the Debtor was ostensibly acting as a steward of the Inherited Properties for Mr. Miller, who was a poor manager of his own finances. Again, according to at least two witnesses, Mr.

Miller allegedly retained full ownership and control over the Inherited Properties, and he could merely "ask for his properties back at any time."

**The Dooley Road Property**

The Dooley Road Property is the subject of the greatest deal of prepetition litigation. The John Mac Joint Venture, a partnership between Delmo Johnson, Jr. and Gene McCutchin (i.e. John and Mac), acquired the Dooley Road Property from Continental Mechanical Corporation in 1981.[6] The inclusion of a hyphen in the name of the joint venture would cause multiple years of litigation.

By a series of deed transfers, the Dooley Road Property "changed hands" several times:

- In a deed dated March 9, 2020, Mr. Miller conveyed his interest in the Dooley Road Property from himself individually back to the Johnson Estate, where the Debtor was then executor.[7]
- Next, on May 3, 2021, Mr. Miller executed a deed conveying Mr. Miller's interest in the Dooley Road Property from the Johnson Estate to the John Mac Joint Venture, an Indiana corporation formed by the Debtor on May 4, 2021. Ms. Froman notarized the deed.[8]

On March 2, 2022, Gene McCutchin filed suit against Debtor, Mr. Miller, and the John Mac Joint Venture, styled as *Gene McCutchin, individually and on behalf of the John Mac Joint Venture, a Texas partnership v. Kevin Miller, John W. Petros, and John Mac Joint Venture Co*, Cause No. DC-22-02323 in the 191st District of the District Court of Dallas County, Texas before the Honorable Gena Slaughter (the **"Dooley Lawsuit"**). In the Dooley Lawsuit, McCutchin

---

[6] *See* ECF No. 117-8. The Court will note that the Exhibit List [ECF No. 117] filed by the Movant had all exhibit numbers one numerical digit off. The Court's citation herein is to the number of the exhibit on the actual Exhibit List.
[7] *See* ECF No. 117-10.
[8] *See* ECF No. 117-11.

alleged that the re-plat and the conveyances orchestrated by the Debtor violated McCutchin's rights in and to the Dooley Road Property. During the course of the Dooley Lawsuit, the Dooley Road Property was transferred at least two more times, further confusing the record of title.

- On July 1, 2022, Mr. Miller executed another deed from the John-Mac Joint Venture back to the Johnson Estate.[9]
- Then, on August 1, 2022, Mr. Miller (as the managing member of the John-Mac Joint Venture) executed a deed from the John-Mac Joint Venture to the Debtor personally.[10]

Ultimately, the state court awarded the Dooley Road Property to Gene McCutchin. The final judgment entered on February 21, 2023, which was not appealed, found, among other things, that the Debtor, Mr. Miller and John Mac Joint Venture Co. (created by the Debtor) "have no rights to any property, real or personal, owned by the John Mac Joint Venture."[11] The court further awarded the Dooley Road Property to the John Mac Joint Venture, with McCutchin owning 100% of the venture.[12]

Subsequently, by deeds dated April 9, 2023, August 17, 2023, and December 1, 2023, the John Mac Joint Venture transferred the Dooley Road Property to McCutchin Hangars, LLC.[13] On December 1, 2023, McCutchin Hangars, LLC transferred the Dooley Road Property to Eagle Aviation LLC, an entity owned by Mr. Miller.[14] At the time the Debtor filed his bankruptcy petition, the Movant alleges that Eagle Aviation, LLC held record title to the Dooley Road Property.

---

[9] *See* ECF No. 117-13.
[10] *See* ECF No. 117-14.
[11] *See* ECF No. 117-39 at 8.
[12] *Id.*
[13] *See* ECF Nos. 117-40, 41, 42.
[14] *See* ECF No. 117-43.

Despite the contrary state court judgment in the Dooley Lawsuit, on December 6, 2023, the Debtor filed his schedules of assets, therein stating that he personally owned the Dooley Road Property, specifically noting a Deed File No. 20220021006.[15] In fact, the Dooley Road Property address, 15790 Dooley Road, is reflected as the Debtor's address on the petition.[16]

The Debtor also engaged in a series of transactions ***post-petition***. Specific to the Dooley Road Property, on January 24, 2024, without any authority from this Court or the state court, the Debtor re-filed the August 1, 2022, deed, as "Being re-recorded to Correct Order", purporting to transfer the Dooley Road Property from the John-Mac Joint Venture to the Debtor personally.[17]

**The Manufacturing Street Properties (1300 and 1340 Manufacturing Street)**

The 1300 and 1340 Manufacturing Street Properties are subject to less prepetition litigation but equal turbidity. On May 6, 2017, Mr. Miller, as executor to the Johnson Estate, executed a deed transferring the 1340 Manufacturing Street Property from Mr. Miller to the Debtor individually.[18] The Debtor's spouse, Ms. Froman, notarized the deed. Then, ten days later, on May 16, 2017, the Debtor deeded the 1340 Manufacturing Street Property to Oro Montana S.A. Inc.[19] Ten days after that, on May 26, 2017, Oro Montana S.A. Inc. deeded the 1340 Manufacturing Street Property back to the Debtor with the Debtor signing as "Director" and Ms. Froman notarizing the deed.[20] That same day, the Debtor deeded the 1340 Manufacturing Street Property back to Mr. Miller with Ms. Froman notarizing the deed.[21]

---

[15] *See* ECF No. 1 at 9.
[16] *See* ECF No. 1.
[17] *See* ECF No. 117-47.
[18] *See* ECF No. 117-15.
[19] *See* ECF No. 117-16.
[20] *See* ECF No. 117-17.
[21] *See* ECF No. 117-18.

As it pertains to the 1300 Manufacturing Street Property, on May 9, 2017, Mr. Miller executed a deed transferring the 1300 Manufacturing Street Property from Johnson Grain Company, the ownership of which was part of the Johnson Estate inherited by Mr. Miller, to Mr. Miller with Ms. Froman notarizing the deed.[22] Then, on May 19, 2017, Mr. Miller executed a deed transferring the 1300 Manufacturing Street Property back to Johnson Grain Company again with Ms. Froman notarizing the deed.[23] Less than a month later, on June 12, 2017, Mr. Miller executed a deed transferring both Manufacturing Street Properties to Johnson Grain Company.[24] Finally, on October 1, 2018, signing as "director," the Debtor caused the Johnson Grain Company to transfer the 1340 Manufacturing Street Property (but not the 1300 Manufacturing Street Property) to San Jacinto Operating Company.[25]

**The Rock Island Properties (1815 and 1901 Rock Island Street)**

On May 9, 2017, Mr. Miller, as executor, executed a deed transferring the 1901 Rock Island Property from the Johnson Estate to Mr. Miller individually.[26] Then, on May 19, 2017, Mr. Miller executed a deed transferring the 1901 Rock Island Property from Mr. Miller to Phoenix Gold Mining Corporation, an entity allegedly used by the Debtor in the past.[27] On September 8, 2017, Mr. Miller executed a quitclaim deed transferring the 1815 Rock Island Property from himself to Phoenix Gold Mining Corporation.[28] Ms. Froman, the Debtor's spouse, notarized each of these deeds.

[22] *See* ECF No. 117-19.
[23] *See* ECF No. 117-20.
[24] *See* ECF No. 117-21.
[25] *See* ECF No. 117-22.
[26] *See* ECF No. 117-23.
[27] *See* ECF No. 117-24.
[28] *See* ECF No. 117-25.

On May 23, 2017, Mr. Miller executed a deed notarized by Ms. Froman transferring the 1901 Rock Island Property from Johnson Realty Co. to Tahoe Gold Mining and Refining Company, an entity formed by the Debtor.[29] The incorporator and registered agent of Tahoe Gold Mining and Refining Company, as indicated in its certificate of formation, is Tsukuda-America Inc., another entity allegedly used by the Debtor in the past.[30] On March 19, 2018, the Debtor caused Phoenix Gold Mining Corporation and Tahoe Gold Mining and Refining Company to transfer the Rock Island Properties to HTB Casino Holdings, LLC, the sale of which was financed by Phoenix Gold Mining Corporation and Tahoe Gold Mining and Refining Company, as evidenced by a deed of trust from HTB Casino Holdings, LLC to Phoenix Gold Mining Corporation and Tahoe Gold Mining and Refining Company executed at the same time.[31] The deed of trust was assigned twice pre-petition: first, from Phoenix Gold Mining Corporation and Tahoe Gold Mining and Refining Company to San Jacinto Operating Company (with the assignment executed by the Debtor as "Director") on January 24, 2019; then from San Jacinto Operating Company to Baxter Mountain Development Co. (with the assignment executed by the Debtor as "Director") on July 27, 2021.[32]

**The Midway Road Property**

On April 10, 2019, Mr. Miller executed a deed transferring the Midway Road Property from Mr. Miller to Phoenix Gold Mining Corporation.[33] The property was then transferred from

[29] *See* ECF No. 117-26.
[30] *See* ECF No. 117-27.
[31] *See* ECF Nos. 117-28, 29.
[32] *See* ECF Nos. 117-30, 31.
[33] *See* ECF No. 117-32.

Phoenix Gold Mining Corporation (with the Debtor signing as Director) to Baxter Mountain Development Company on May 4, 2021.[34]

**The Swanson Landing Property**

Mr. Miller executed a deed transferring the Swanson Landing Property to Phoenix Gold Mining Corporation on April 10, 2019.[35] The Debtor then caused the Swanson Landing Property to be transferred to Mr. Miller's mother, Harva Dale Miller, on March 7, 2022,[36] only for the property to be transferred back to the Debtor on August 11, 2023, months before bankruptcy.[37]

**The Saint Lazare Property**

The Debtor has not claimed an interest in the Saint Lazare Property. However, on March 1, 2022, Mr. Miller executed a deed transferring the Saint Lazare Property to Oro Montana SA Inc.[38] The property was subsequently transferred to Harva Dale Miller by the Debtor.[39]

**The Witnesses**

The only witness that the Debtor called was Harva Dale Miller, Kevin Miller's mother. Ms. Miller testified that Mr. Petros and Ms. Froman are good friends of the family, and that Ms. Froman had "handled all of Delmo's paperwork for him."[40] She testified that the Debtor had orchestrated exchanges of the Swanson Property and the St. Lazare Property, for example. She testified that, at least with respect to certain of the Inherited Properties, Mr. Petros had put properties into his name "to keep [Mr. Miller] from losing everything."[41] She testified that her son

[34] *See* ECF No. 117-33.
[35] *See* ECF No. 117-34.
[36] *See* ECF No. 117-35.
[37] *See* ECF No. 117-36.
[38] *See* ECF No. 117-37.
[39] *See* ECF No. 117-38.
[40] ECF No. 128 at 229.
[41] *Id.* at 213.

"was getting in trouble and [owed] all these people money".[42] She testified that Mr. Petros put some of his own money into the properties although such contribution was never quantified. She testified that if the Debtor were to get "Manufacturing" "up and running", that would give Mr. Miller "a living for the rest of his life".[43] She testified credibly in response to the Court's questioning that it was her "understanding if Mr. Miller ever asked for the properties back from Mr. Petros, that Mr. Petros would give them to him".[44] The Court did not find Ms. Miller to lack credibility; however, she had very little direct personal knowledge of the requisite documentary evidence and there was a palatable and historical derision between her and the Movant and his professionals, which made it difficult to glean many concrete facts from the witness.

The Debtor chose not to testify. The Debtor was listed on the Debtor's witness list filed prior to the Hearing,[45] as well as the Debtor's amended witness list filed the night before the Hearing.[46] The Debtor affirmatively represented at the June 25, 2024, status conference that he was available on July 22, 2024, and would attend the hearing on the Motion. At the Hearing itself, Debtor's counsel announced that the Debtor would not be attending because of a "pre-planned vacation." The Court is very skeptical of this statement. At best, the Court believes the Debtor made a tactical decision not to attend, which supposition is thoroughly supported by comments made by his counsel at the Hearing. At worst, the Debtor intentionally lied to a tribunal. In any event, the Debtor's absence greatly impeded the Court's fact-finding, and the Court draws a negative inference from the same. The Court infers from his failure to appear that he does not have any facts to contest a finding of bad faith.

[42] *Id.* at 227.
[43] *Id.* at 230.
[44] *Id.* at 229.
[45] *See* ECF No. 118.
[46] *See* ECF No. 120.

The Movant also did not testify. His absence was not addressed. Although the Movant alleges in the Motion that the Debtor "fraudulently induced" the Movant to execute dozens of real estate documents, the Movant did not testify, which again greatly impeded the Court's fact-finding. The Court draws a negative inference from the same, which lends greatly to the Court's ultimate decision that a neutral needs to sort through these myriad transfers.

The Movant called three (3) witnesses: Andrew Johnson "A.J." Irwin, IV, Daniel Stephens, and Ryan Starnes.

Mr. Irwin is a private investigator who testified that he has investigated the Debtor, Ms. Froman, and their business dealings involving, *inter alia*, the Inherited Properties. Movant's counsel used Mr. Irwin essentially as a conduit to walk the Court through the greater part of the Movant's documentary evidence, highlighting serious discrepancies between the Debtor's schedules, the transcript of the § 341 Meeting of creditors at which the Debtor testified and various deeds and other real estate documents. The Court found Mr. Irwin to be a credible witness but limited in his first-hand knowledge.

Mr. Ryan Starnes is an attorney that has represented Mr. Miller in a corporate and litigation capacity outside of this Court. He testified that he was present at a meeting with the Debtor, the Movant, Ms. Froman, Harva Dale Miller and the Movant's father-in-law in June 2023 where the Debtor confirmed that the Inherited Properties belonged to the Movant and that "Mr. Petros' reasoning for the transfers . . . were to look out for Kevin's best interest, sort of a, you know, saving Kevin from himself type of position. . . . And that, finally, . . . all Kevin needed to do was request that they be put back in his name and that was no big deal . . . that would happen."[47] He further testified that when the Movant's father-in-law began asking Mr. Petros basic questions

[47] ECF No. 128 at 152.

about the properties at the meeting, the Debtor "exploded, yelled, [and] demanded that the meeting was over and that he and [Ms. Froman] were leaving."[48] The Court found Mr. Starnes to be credible primarily in that he echoed the testimony of Ms. Harva Dale Miller.

Mr. Daniel Stephens testified by declaration.[49] Debtor's counsel chose not to cross-examine him. Mr. Stephens testified that he is the managing partner of Maker Aerospace, LLC. He met John Seagaze a/k/a John Petros in April of 2021 while looking to purchase and/or acquire an airplane hangar. He viewed an advertisement which listed John Seagaze as the primary contract for a hangar located in Addison, Texas. It would be much later that he learned that John Seagaze was actually John Petros. He visited the property and met with Mr. Petros and Ms. Froman. Mr. Stephens testified that Mr. Petros represented to him that Ms. Froman was a real estate agent who assisted in Mr. Petros's properties and transactions. He only later learned that Ms. Froman and Mr. Petros were married.

On April 2021, Mr. Stephens executed, on behalf of Maker Aerospace LLC, a contract for deed with Baxter Mountain Development Co. for the purchase of Unit J of the Midway Road Property. During the entirety of the transaction, Mr. Petros represented that he was the owner of Baxter Mountain Development Co. He made a $12,000.00 down payment to purchase the property and made subsequent monthly payments of $4,000.00 towards the total purchase price. All monthly payments were sent via ACH to Baxter Mountain Development Co.

In or around November of 2022, the Debtor contacted him offering to sell him additional properties located at 15790 Dooley Rd, Addison, Texas 75001. The Debtor represented to him that he was the owner of all the properties. In January of 2024 (while the Debtor was in bankruptcy), he received a phone call from the Debtor informing him that going forward the monthly payments

[48] *Id.* at 155.
[49] *See* ECF No. 117-52.

needed to be sent to a different banking account. Mr. Petros informed him that the reasoning behind the change in accounts was because he was "moving around some items" and payments needed to be routed to a different banking account.

He testified that he received a subsequent email from Mr. Petros' personal email account (seagaze260@gmail.com) indicating that the payments should go to his personal bank account and no longer to Baxter Mountain Development Co.'s banking account.

In total, Mr. Stephens testified that he has paid approximately $150,000.00 towards the property. Payments towards the property for March, April and May of 2024 have gone directly to Mr. Petros' personal bank account. He was never made aware by Mr. Petros of any bankruptcy proceeding. Nor was he ever made aware by Mr. Petros of any pending lawsuits against Mr. Petros regarding the property.

## IV. LEGAL STANDARD.

Pursuant to section 1112(b)(1) of the Bankruptcy Code, the court "shall" dismiss ***or convert*** a chapter 11 case for cause, whichever is in the best interest of the creditors and the estate, unless the court determines that the appointment of a trustee or an examiner under section 1104 would better serve those interests. 11 U.S.C. § 1112(b)(1). However, section 1104 does not apply in a case administered under Subchapter V, therefore this Court has no power to appoint a chapter 11 trustee or an examiner in this case.[50] "Section 1112(b)(4) contains a non-exclusive list of what constitutes 'cause' for purposes of dismissal, but the Fifth Circuit Court of Appeals has held that the term 'cause' affords flexibility to the bankruptcy courts and can include a finding that the

[50] *See* 11 U.S.C. § 1181(a); *but see* 11 U.S.C. § 1185(a) ("the court ***shall order*** that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor…"); *see also In re Ozcelebi* 639 B.R. 365, 426 (Bankr. S.D. Tex. 2022) ("[T]here exists no governing authority which outlines the standards the court should consider in determining whether to remove a debtor in possession under § 1185.").

debtor's filing for relief is not in good faith." *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021) (Hale, C.J.) (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-3 (5th Cir. 1986)).

The Fifth Circuit has provided the following guidance with regard to the "good faith standard" required in bankruptcy proceedings:

> Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings. Such a standard furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. [A r]equirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the judicial integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors with 'clean hands.'

*Little Creek*, 779 F.2d at 1071 (internal quotations omitted). Courts have held that a chapter 11 petition is not filed in good faith unless it serves a valid bankruptcy purpose. *See Nat'l Rifle Ass'n*, 628 B.R. at 270-71 (quoting *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999)). The movant bears the initial burden of making a prima facie case showing a lack of good faith in the debtor's filing, after which the burden shifts to the debtor to demonstrate good faith. *Id.* at 270 (quoting *In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *7 n. 20 (Bankr. N.D. Tex. Jan. 26, 2005) (Lynn, J.)).

Debtors in bankruptcy have an ***absolute*** duty to report "the existence of assets whose immediate status in the bankruptcy is uncertain, even if the asset is ultimately determined to be outside of the bankruptcy estate." *U.S. v. Beard*, 913 F.2d 193, 197 (5th Cir. 1990). The "operation of the bankruptcy system depends on honest reporting, ... [t]he consequences for playing fast and

loose with the Bankruptcy Code's disclosure requirements are severe." *Ozcelebi*, 639 B.R. at 397-98.

Pursuant to section 521 of the Bankruptcy Code, unless the Court orders otherwise, a debtor must file a schedule of assets and liabilities, a schedule of current income and expenditures, and a statement of the debtor's financial affairs. *See* 11 U.S.C. § 521(a)(1); *see also* FED. R. BANKR. P. 1007(b)(1). Bankruptcy Schedules A/B through J (the **"Schedules"**) and the Statement of Financial Affairs for Individuals Filing for Bankruptcy (**"SOFA"**) direct debtors to "[b]e as complete and accurate as possible" in filling out the forms. *See* Official Forms 106A/B, 106C, 106D, 106 E/F, 106G, 106H, 106I, 106J, 107. By virtue of the Declaration About an Individual Debtor's Schedules (**"Declaration"**), a debtor must certify that "under penalty of perjury" that he has read the summary and Schedules filed with the Declaration and that they are true and correct. *See* Official Form 106Dec.

Under section 1187 of the Bankruptcy Code, the reporting requirements in sections 308 and 1116 apply to a Subchapter V debtor. *See* 11 U.S.C. § 1187. Section 308 requires a debtor in possession to file periodic reports relating to (1) the debtor's profitability; (2) the debtor's cash receipts and disbursements; and (3) whether the debtor is timely filing tax returns and paying taxes and other administrative expenses. *See* COLLIER ON BANKRUPTCY ¶ 308.01 (Richard Levin & Henry J. Sommer eds., 16th ed. 2024). Bankruptcy Rule 2015(a)(6) provides that prior to the effective date of the plan, conversion or dismissal, a debtor in a chapter 11 case shall file monthly reports on Official Form 425C, unless the court orders otherwise. *See* FED. R. BANKR. P. 2015(a)(6). Official Form 425C requires a debtor to declare that "under penalty of perjury," the debtor has examined the monthly operating report and accompanying attachments and certify that

to the best of the debtor's knowledge, the documents are "true, correct, and complete." *See* Official Form 425C.

Evidence that a debtor has withheld financial information may result in a finding of bad faith. *Ozcelebi*, 639 B.R. at n. 244 (citing *In re Unruh*, 265 F. App'x 148, 150 (5th Cir. 2008)).[51] If "cause" is found for dismissal, a court must decide whether conversion or dismissal is in the best interests of the creditors and the estate. *See* 11 U.S.C. § 1112(b)(1). "There is no bright line test to determine whether conversion or dismissal is in the best interest of creditors and the estate." *Ozcelebi*, 639 B.R. at 425. Likewise, the Fifth Circuit has noted that bankruptcy courts are "afforded wide discretion" in deciding whether a case should be converted to chapter 7. *In re Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986).

## V. ANALYSIS.

The Bankruptcy Code functions as a shield to provide individuals and entities in financial distress with the breathing room to reorganize their affairs and gain a fresh start whilst simultaneously protecting the rights of individuals and entities whose assets and affairs are intertwined with that of the debtor's. *See generally* M. Bienenstock, BANKRUPTCY REORGANIZATION 2-4 (1987) (discussing "Equity Policy" and "Reorganization Policy"). In exchange for the considerable benefits bestowed upon debtors who choose to invoke the bankruptcy process, there are also certain burdens each debtor must undertake, chief among them are honesty and public disclosure. The integrity of the bankruptcy process rests upon the careful

[51] Furthermore, the omission of assets on a debtor's bankruptcy schedules constitutes a crime under 18 U.S.C. § 152. Under that statute, a person who "knowingly and fraudulently" conceals from an officer of the court, creditors, or the United States Trustee "any property belonging to the estate of a debtor" shall be fined, imprisoned not more than 5 years, or both. *See* 18 U.S.C. § 152(1). Similarly, any person who "knowingly and fraudulently" makes a false oath or account in or in relation to any bankruptcy case, including making a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, shall suffer the same consequences. *See* 18 U.S.C. §§ 152(2)-(3). Furthermore, a person who, in contemplation of a bankruptcy case "knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation[,]" is punishable in the same manner. 18 U.S.C. § 152(7).

balance of these benefits and burdens, without which the rights of both debtors and creditors would be imperiled. Indeed, without proper disclosure, the informed negotiations that are a centerpiece of the bankruptcy process cannot realistically take place. It is for this reason that the debtor bears fiduciary duties to both the estate and its creditors.

In the instant case, the Movant, Mr. Miller, alleges that the Debtor seeks to utilize the bankruptcy process as a sword rather than as a shield and that the Debtor has failed to fulfill his fiduciary duties to the estate and its creditors. Specifically, the Movant posits that the Debtor sought to utilize the bankruptcy process to further perpetrate a cloud on title for several properties that the Movant purports to own as inheritance from his late adoptive father. In filing this case, the Movant alleges that the Debtor (1) failed to disclose his ownership interest in certain real property, corporate entities, and insurance policies; (2) failed to include certain creditors of the estate on his initial list of creditors, including the Movant, causing those creditors to lack timely notice of the bankruptcy proceeding; and (3) used, sold, or transferred certain property of the estate both without this Court's approval and outside of the ordinary course of business.

Though the Court finds that the Movant's case in chief was by no means complete on all counts, the Movant bore its burden of proving a prima facie case of bad faith justifying cause for conversion or dismissal of this case by a preponderance of the evidence. Together with the Court taking judicial notice of its own docket, the Court unequivocally finds that the Movant has certainly pointed the Court towards enough "smoke" to prove the existence of flames.

**A. The Debtor's Schedules and SOFA Are Not True, Complete, or Correct**

As mentioned above, section 521 of the Bankruptcy Code requires a debtor to file a schedule of their assets and liabilities, their current income and expenditures, and a statement of their financial affairs. 11 U.S.C. § 521(a)(1); *see also* FED. R. BANKR. P. 1007(b)(1). Debtors also have an absolute duty to ensure their schedules and statement of financial affairs are complete and

accurate. *Unruh v. Tow*, No. 04-35947-H1-7, 2006 WL 8446449, at *2 (5th Cir. Jan. 27, 2006). "Individually, any one answer may have been the result of an innocent mistake. However, the cumulative effect of all [of a debtor's] falsehoods together evidences a pattern of reckless and cavalier disregard for the truth." *In re Mitchell*, 102 F. App'x 860, 863 n.3 (5th Cir. 2004) (quoting *Econ. Brick Sales, Inc. v. Gonday (In re Gonday)*, 27 B.R. 428, 433 (Bankr.M.D.La.1983)).

Here, the Debtors' Schedules and SOFA were initially filed with, at best, incomplete information. Over the course of the bankruptcy case, the Debtor has materially amended these forms multiple times at least five times in nine months. The Debtor represented that he owns no interest in nor holds a role as a director or officer of any public or private corporation, signing declarations under penalty of perjury on both his Schedules and SOFA that represent the same, yet throughout the course of this bankruptcy proceeding, he has also signed multiple deeds in his apparent role as president or director of several corporate entities allowing properties to be transferred into his name. The Debtor's counsel represented to the Court multiple times at the Hearing that the Debtor owns interest in title insurance policies but has never listed such interests as assets on his Schedules or SOFA. For the reasons that follow, these unexplained inaccuracies, coupled with a negative inference the Court takes from the inconsistency between Debtor's representations to the Court and his subsequent actions, the Court concludes that cause exists to dismiss or convert the bankruptcy case under section 1112(b) of the Bankruptcy Code.

1. <u>Real Property</u>

The Debtor commenced the instant case on December 6, 2023, by filing his Voluntary Petition for Individuals Filing for Bankruptcy (the "**Petition**").[52] In his Petition, the Debtor claims to reside at the Dooley Road Property.[53] The Debtor states that he is the sole proprietor of a single

[52] *See* ECF No. 1.
[53] *Id.* at 2.

asset real estate business known as "John Petros Sole Proprietor."[54] The Debtor elected treatment under Subchapter V of Chapter 11, estimating both his assets and liabilities at between "$1,000,001-$10 million".[55]

Attached to the Petition were Official Forms 106A/B through J alongside 106Dec and 106Sum (together, the "**Initial Schedules**"), and 104 (the "**Creditor List**"). In the Debtor's Initial Schedules, he only claims to own an interest in two pieces of real property: the Dooley Road Property and the Swanson Property.[56] On his SOFA, filed at ECF No. 20, the Debtor states that the Dooley Road Property had been "seized without notice" on March 10, 2023, by Gene McCutchin.[57] However, in the section where the Debtor was to disclose whether he was a party in a lawsuit, court action, or administrative proceeding "within 1 year before you filed for bankruptcy," he failed to mention the Dooley Lawsuit.[58] Notably, in the SOFA, the Debtor also marked "no" to the question, "[d]o you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone."[59] This of course is contrary to the sworn testimony of his own witness, Ms. Harva Dale Miller. The Debtor proceeded to amend his Initial Schedules substantively at least ***five*** times.

On January 11, 2024, the Debtor amended his Schedule A/B in order to add the following real property to the estate: 6973 FM 281, Sections 395, 405, 437, Sunray, TX 79086 (the "**Moore County Property**").[60] Less than one month later, on February 2, 2024, the Debtor once more amended his Schedule A/B.[61] However, this time, the Debtor listed the following real properties:

[54] *Id.* at 4.
[55] *Id.* at 7.
[56] *Id.* at 9.
[57] *See* ECF No. 20 at 5.
[58] *Id.*
[59] *Id.* at 10.
[60] *See* ECF No. 26 at 2.
[61] *See* ECF No. 46.

(1) the Dooley Road Property; (2) the Moore County Property, (3) the Midway Road Property; (4) the Swanson Property; (5) the 1300 Manufacturing Property; and (6) the 1815 Rock Island Property.[62] Notably, the Debtor also amended Schedule I on February 2, 2024, amending his income to reflect a new line item: "Real Estate Notes" with a value of $44,821.00.[63] Three days later, the Debtor filed a new Declaration under penalty of perjury certifying the information was true and correct on his amended Schedules, which had been signed the same day as the amended Schedules.[64]

On February 20, 2024, two weeks after the §341 Meeting was adjourned, the Debtor filed a further amendment to his Schedules, noting, among other things, a new Building and Land Lease with Silo Management Group LLC for the 1340 Manufacturing Street Property.[65] The Debtor signed the Declaration attached to the amended Schedules on that date, certifying the information contained within was true and correct.[66]

On April 14, 2024, the Debtor filed an affidavit,[67] averring to the Court as follows:

> 2. As shown on my amended *Schedule A/B* [Docket No. 53] (the "Schedules"), I am the owner of the following real properties (collectively, the "Properties").
>
> a. 1901 Rock Island Street, Dallas, Texas 75207;
> b. 1815 Rock Island Street, Dallas, Texas 75207;
> c. 15790 Dooley Road, Addison, Texas 75001;
> d. 15770 Midway Road, Addison, Texas 75001;
> e. 1340 Manufacturing Street, Dallas, Texas 75207;
> f. 1579 Swanson Landing Rd., Karnack, Texas 75661; and
> g. 1300 Manufacturing Street, Dallas, Texas 75207.

---

[62] *Id.* at 1-3.
[63] *Id.* at 14.
[64] *See* ECF No. 50.
[65] *See* ECF No. 54.
[66] *Id.* at 14.
[67] *See* ECF No. 68.

> 3. Prior to my bankruptcy filing on December 6, 2023, Kevin Miller ("Miller") transferred all of his rights in the Properties to myself due to Miller's inability to (i) remedy the environmental issues associated with the Properties; (ii) pay and keep current all ad valorem taxes; (iii) maintain insurance; and (iv) renovate and improve the Properties (collectively, the "Outstanding Action Items"). Due to the high costs associated with the Outstanding Action Items, Miller voluntarily consented to transferring the deeds to be in my name.

On May 13, 2024, the Debtor filed a Complaint against Mr. Miller in this Court, Adversary Case No. 24-3033.[68] In the Complaint, Mr. Petros claims to be the rightful owner of Midway Road (via post-petition transfer from Baxter Mountain); the Rock Island Properties (via post-petition transfer from Baxter Mountain); the Manufacturing Properties (via post-petition transfer from multiple post-petition transfers from San Jacinto Operating Company and Johnson Grain Company); the Swanson Property; and the Dooley Property.[69]

On May 21, 2024, nearly three months after the February 20th amendment to the Debtor's Schedules, the Debtor filed a further amendment of Schedule A/B, now claiming only the Dooley Road Property and Swanson Property as property of the estate.[70] Notably, for the first time, in the May 21st amendment to Schedule A/B, the Debtor lists a 100% ownership interest in four companies worth millions of dollars: (1) San Jacinto Operating Co.; (2) Johnson Grain Company; (3) Oro Montana S.A. Inc.; and (4) Baxter Mountain Development Co., none of which had ever before been claimed on any of the Debtor's Schedules.[71]

On August 9, 2024, days after the Hearing on the instant Motion, the Debtor once more amended his Schedules, this time removing any reference to ownership of the four aforementioned

---

[68] *Petros v. Miller*, Adv. Case No. 24-3033, ECF No. 1 (Bankr. N.D. Tex.).
[69] *Id.*
[70] *See* ECF No. 92 at 1-2.
[71] *See id.* at 3.

entities and maintaining ownership of only the Dooley Road Property and the Swanson Property.[72] It appears that this amendment mirrors much of the Initial Schedules in terms of properties and assets claimed.[73] No reasonable explanation could be given for the multiple of repeated changes; rather Debtor's counsel could only offer the explanation that the Debtor may have been trying to "over disclose" due to circumstances occurring **post-petition**. The Court finds this argument improbable and contrary to documentary evidence. This is exactly the type of issues the Debtor would have had an opportunity to explain if had bothered to attend the Hearing.

2. Financial Assets

When asked to describe his financial assets in his Initial Schedules, the Debtor listed (1) $35,000.00 in cash; (2) a Navy Federal account marked "Personal" with a balance of $2,937.00; (3) another account marked "Business" with a balance of $2,626.00; and (4) a final bank account marked "Operating Funds" with a balance of $24,179.00.[74] The Debtor also listed two claims in his Initial Schedules, denoted as "Mccutchin Hangars, LLC Quiet Title Action," and "IR Air, Inc, Salvador Ochoa Aircraft Title Issue," for $750,000.00 and $250,000.00, respectively.[75] The Debtor separately listed an interest under the heading "crops-either growing or harvested". The Debtor provided the following detailed description under the entry: "Need It More L.P. Justin Crownover Owner". This interest was recorded as having a current value of $832,042.00 as of the Petition Date.[76] All in all, the total value of all property scheduled on Schedules A/B in the Initial Schedules was $3,548,784.00.[77]

---

[72] *See* ECF No. 143 at 1-4.
[73] *Compare id. with* ECF No. 1.
[74] *See* ECF No. 1 at 13.
[75] *Id.* at 16.
[76] *Id.* at 18.
[77] *Id.*

In his Initial Schedules, the Debtor marked "no" for each of the following categories: (1) bonds, mutual funds, or publicly traded stocks; (2) non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture; (3) government and corporate bonds and other negotiable and non-negotiable instruments; (4) retirement or pension accounts; (5) security deposits and prepayments; (6) annuities; (7) interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program; (8) trusts, equitable or future interests in property, and rights or powers exercisable for your benefit; (9) patents, copyrights, trademarks, trade secrets, or other intellectual property; (10) licenses, franchises, and other general intangibles; (11) tax refunds owed to you; (12) family support; (13) other amounts someone owes you; (14) interests in insurance policies; (15) any interest in property that is due you from someone who has died; and (16) **any financial assets you did not already list**.

When asked to describe any "business-related property you own or have an interest in[,]" the Debtor checked "no" on each box, including: (1) business-related property; (2) accounts receivable or commissions you already earned; (3) office equipment, furnishings, and supplies; (4) machinery, fixtures, equipment, supplies you use in business, and tools of your trade; (5) inventory; (6) interests in partnerships or joint ventures; (7) customer lists, mailing lists, or other compilations; (8) any business-related property you did not already list.

On January 11, 2024, the Debtor amended his Schedule A/B, reflecting a new bank account: "CAPITAL ONE Debtor in Possession" with a balance of $63,403.00.[78] The bank account that had previously been denoted "Personal" now reflected a new label, "SSI".[79] The

[78] *See* ECF No. 26 at 5.
[79] *Id.*

"Business" account had been drained to a balance of "0.01" and denoted "Business Closed".[80] Finally, the account that had been previously denoted as "Operating Funds" was renamed "Savings".[81] On January 11th, the Debtor also listed a new asset under the heading "farm and fishing equipment, implements, machinery, fixtures, and tools of trade," describing this asset as "Motors, Pumps, and Irrigation Systems (2022 – 2023 Crop Liens)" valued at $1,500,000.00.[82] This increased the total value of all properties listed on Schedule A/B to $5,998,961.00.[83] The Debtor declared, under penalty of perjury, that he had read the amended summary and Schedules filed, and that they were "true and correct".[84]

On February 2, 2024, the Debtor further amended his Schedule A/B, this time reflecting two bank accounts that had not been listed before: (1) "Johnson Grain Business" valued at $124.33, and (2) "Inwood Bank Richardson Operating Fund" valued at $100.00.[85] Notably, on February 2, 2024, less than one month after his prior amendment to Schedule A/B, the Debtor's Capital One "DIP Operating Funds" account reflected a balance of $324,815.29 where the prior balance had been only $63,403.00.[86] This account balance would remain roughly the same over the next two amendments of Schedule A/B.[87] On February 20, 2024, the Debtor further amended his Schedule A/B, this time listing under the heading "other amounts someone owes you" a line item described as "Kevin Miller owes Debtor commissions and expenses at $10,000.00 monthly 3/15/2017 thru 2/1/2024".[88] This line item is valued at $600,000.00.[89] Notably, this claim was not listed on any

---

[80] *Id.*
[81] *Id.*
[82] *Id.* at 10.
[83] *Id.*
[84] *See* ECF No. 30.
[85] *See* ECF No. 46 at 7.
[86] *Compare id. with* ECF No. 26 at 5.
[87] *See* ECF Nos. 53, 92.
[88] *See* ECF No. 53 at 9.
[89] *Id.*

of the three prior versions of the Debtor's Schedules.[90] Kevin Miller was also not listed as a creditor of the Debtor, nor in any other capacity, despite his involvement in prior litigation as a codefendant with the Debtor within the year prior to the Petition Date.[91]

*a. Ownership of or Connections to Corporate Entities*

On his Initial Schedules, the Debtor stated that he did not own stock or any other interest in any private business.[92] On page 11 of the SOFA, the Debtor marked "no" in answer to the question "[w]ithin 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?"[93] Included as options for the Debtor to respond in the affirmative were multiple boxes, representing: (1) A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time; (2) a member of a limited liability company (LLC) or limited liability partnership (LLP); (3) a partner in a partnership; (4) an officer director, or managing executive of a corporation; and (5) an owner of at least 5% of the voting or equity securities of a corporation.[94]

On February 2, 2024, the Debtor filed an amended SOFA, indicating that he had served as "an officer, director, or managing executive of a corporation" within the four years before he filed for bankruptcy.[95] The Debtor listed three businesses for which he had served in such a capacity: (1) Johnson Grain Company, (2) San Jacinto Operating Co., and (3) Baxter Mountain Development.[96] Each company was described as a "Real Estate Leasing" company and the Debtor was listed as the accountant or bookkeeper for each.[97] The Debtor also amended his Schedule

[90] *See, e.g.,* ECF Nos. 1, 26, and 46.
[91] *See id.*
[92] ECF No. 1 at 13.
[93] ECF No. 20 at 11.
[94] *Id.*
[95] *See* ECF No. 43 at 11.
[96] *Id.* at 11-12.
[97] *Id.*

A/B on the same day but listed no ownership interest in any of these companies.[98] On May 13, 2024, the Debtor filed a Complaint, attaching multiple ***pre- and post-petition deeds*** in which he signed as a "director" of various of these entities.[99] On May 21, 2024, the Debtor amended his Schedule A/B to reflect a 100% ownership interest in each of these three companies, plus one more: Oro Montana S.A., Inc.[100] On May 21st, the Debtor also notably listed valuations for each of these companies, stating that Johnson Grain Company was worth $2.3 million and Baxter Mountain Development Co., was worth $1.39 million, but the other two entities were worth $0.00.[101]

The Court has serious concerns regarding how these business interests could have been missing on the Petition Date. Likewise, if Debtor's counsel's argument holds any water, the Court has serious concerns about how a Debtor spontaneously comes into ownership of two multi-million-dollar corporate entities in the midst of a bankruptcy proceeding without transferring estate assets outside the ordinary course of business or having previously hid his ownership of those entities and their assets. This, coupled with the fact that the Inherited Properties were transferred back and forth between the Johnson Estate, Mr. Miller, the Debtor **and these companies**, with the involvement of the Debtor's wife on multiple occasions prepetition, has all the hallmarks of fraudulent activity. Because the Debtor was not present at the Hearing, the Debtor never provided an answer to the Court's questions on these points, which any reasonable debtor should have undoubtedly foreseen the need to explain.

In this regard, the Debtor's conduct in this case is analogous to that of the debtor in *In re D'Anello*, 477 B.R. 13 (Bankr. D. Mass. 2012). In *D'Anello*, a creditor had filed an adversary

---

[98] *See* ECF No. 46 at 7.
[99] *Petros v. Miller*, Adv. Case No. 24-3033, ECF No. 1 (Bankr. N.D. Tex.).
[100] *See* ECF No. 92 at 3-4.
[101] *Id.*

proceeding against the debtor seeking an exception to discharge for (among other alleged conduct) the debtor's embezzlement of funds from a limited liability company the creditor and debtor jointly owned. *Id.* at 15-16; 25. In that case, the creditor/plaintiff did not subpoena the debtor/defendant to testify; however, the debtor represented in the pre-trial memorandum that the debtor would attend and testify at trial. *Id.* at 15-16; 28. Despite such representation, the debtor did not attend. *Id.* In ruling for the creditor/plaintiff and against the debtor/defendant, the *D'Anello* court, stated: "The Court draws a ***negative inference*** from the Debtor's failure to appear and to testify at trial. His absence bolsters the Court's conclusion that he misappropriated monies belonging to Crestwood Builders that were rightfully in his possession with fraudulent intent." *Id.* at 28 (emphasis added).

The Court draws the same negative inferences here. The Debtor participated actively in choosing the date for the Hearing and said multiple times while he was under oath that he would attend. He failed to do so. The Court infers from his failure to appear that he does not have any facts to contest a finding of bad faith. Likewise, the Movant did not testify as to his role in any of these transfers although the Motion is littered with instances of Mr. Miller being "fraudulently induced" into same. Accordingly, the Court draws a negative inference as to his role in such activity, or at least a negative inference as to his complicity with regard thereto.

b. *Interests in Insurance Policies*

At the Hearing, Debtor's counsel argued multiple times that the Court could infer that the Debtor may have interests in several of the properties that are the subject of this dispute simply because he maintains title insurance on same. However, the Debtor never listed any interest in any insurance policies on his Schedules.[102] Once again, because the Debtor failed to appear at the

---

[102] *See, e.g.,* ECF Nos. 1, 26, 46, 53, 92, and 143.

hearing, the Debtor never provided any answer to the Court's expected questions on these points, and the Court draws a negative inference.

**B. Whether Cause Exists for Dismissal or Conversion of the Case and Which Result Would Best Serve the Interests of the Creditors and the Estate**

After a thorough review of the Debtor's myriad iterations of Schedules and SOFAs, the Court concludes that the Debtor has not been truthful or complete in his disclosure of assets and liabilities. The evidence demonstrates that the Debtor ***most likely*** controlled or held ownership interests in the entities known as San Jacinto Operating Co. and Johnson Grain Company as early as 2018, Oro Montana S.A., Inc. as early as 2017 and Baxter Mountain Development as early as 2021, based on documentary evidence, yet failed to disclose same until May 21, 2024, after having apparently transferred multiple real estate properties out of the estate outside the ordinary course of business.[103] Furthermore, although Debtor's counsel was quick to attempt to establish some legitimacy for his client's potential ownership of the properties in question by referring to title insurance policies, no evidence of such policies was admissible, nor indeed did the Debtor ever schedule any interest therein.[104] The Court concludes that the Debtor has made significant misrepresentations throughout his Schedules and SOFAs, the result of which is that he failed to disclose multiple material assets of the estate and has prevented his creditors from having a complete picture of the estate's assets and liabilities.

Moreover, the Court finds that the Debtor gave seriously misleading testimony under penalty of perjury at the § 341 Meeting of Creditors, at a minimum, when he testified that he had no income, and no contracts or leases when hundreds of thousands of dollars begin to flow post-petition as shown on the Debtor's operating reports.[105] He has testified previously that the reason

[103] *Compare* ECF No. 43 at 11-12 *with* ECF Nos. 46 at 7 *and* ECF No. 92 at 3-4.
[104] *See, e.g.,* ECF Nos. 1, 26, 46, 53, 92, and 143.
[105] *See* ECF No. 117-9 and 117-52.

he filed bankruptcy was essentially to collaterally attack the judgment in the Dooley Lawsuit.[106] Finally, the Court has multiple unanswered questions about the veracity and validity of various deeds executed by or in favor of the Debtor and Ms. Froman's actions in connection therewith (as an insider to the Debtor). As such, considerable cause exists for either dismissal or conversion pursuant to 11 U.S.C. § 1112(b) for bad faith.

What is left is for the Court to decide, in its considerable discretion, is what to do with this case. In *In re Sal Caruso Cheese, Inc.*, a chapter 11 debtor was found to have committed a "parade of episodes between the debtor, its insiders and counsel … that appear to have been carried out in direct violation of Code §§ 363, 541, 547, 548, 549, and 1107(a)." 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989). The debtor's business burnt down about a month and a half ***after*** filing a petition for voluntary relief under chapter 11. *Id.* Interestingly, however, the *Sal Caruso* court noted that "the petition and schedules evidence a host of inconsistencies … [which,] when added to the negative responses in the [SOFA], cast doubt on all of the Debtor's disclosures and severely compromise its ability to act with integrity within the context of its Chapter 11." *Id.* at 818. The *Sal Caruso* court noted that significant property (a vehicle) had been transferred post-petition to an insider without that property ever having been properly scheduled, multiple parcels of real property were lumped together with one market value on the schedules, and some properties were omitted from the schedules despite having been listed as collateral for secured loans to major creditors. *Id.* at 817-18. The court concluded that "[t]he record reveals an absolute disregard of the strictures of the Bankruptcy Code or at best a calculated strategy of selective compliance … This Court does not believe that a debtor should be coddled into complying with the Code and then congratulated upon each instance of substantial compliance. The debtor's role as a fiduciary

[106] *See also* ECF No. 117-9.

is a self-executing one." *Id.* at 818. Therefore, the *Sal Caruso* court concluded that the Debtor's breach of its fiduciary duty of disclosure to the creditors and the estate warranted conversion rather than dismissal, saying that even if the court were to charitably characterize the aforementioned activities as "shenanigans … the [c]ourt is more than convinced that this case should be converted to a Chapter 7 proceeding so that an independent trustee can objectively determine the affairs of the estate and begin to maximize its value for the benefit of [d]ebtor's creditors." *Id.*

In another more recent case, *In re Ozcelebi*, a Subchapter V debtor had his case converted to Chapter 11 based upon his lack of good faith in filing the case. 639 B.R. at 423. Rather than "seeking to preserve or create some value that would otherwise be lost outside of bankruptcy," or "maximiz[ing] property available to satisfy creditors," the *Ozcelebi* court found that the debtor had done his best to conceal his true financial condition by concealing the value of his interest in certain trusts, the value of his community property interests, insurance policies in his name, his business connections, and by inflating his liabilities and artificially calculating his salary to distort his debt-to-income ratio, all while the debtor's wife and children received hundreds of thousands of dollars in disbursements from the trusts for their expenses. *Id.* The court in that case concluded that Debtor's falsehoods and failure to make full and candid disclosure, let alone carry out his duties under sections 521 and 1187(b) of the Bankruptcy Code, "evidenced a pattern of reckless and cavalier disregard for the truth," which the court found indicative of both fraudulent intent and bad faith warranting a conversion of the case to Chapter 7. *Id.* at 423-24.

The instant case is on all fours with *Sal Caruso* and *Ozcelebi*, in that there are significant inconsistencies in Debtor's myriad Schedules and SOFAs evidencing either reckless or outright intentional disregard for the truth, especially when compared to the documentary evidence introduced at the Hearing. The Debtor has unquestionably failed to uphold his fiduciary duties to

his creditors by continuously failing to disclose a complete picture of his assets and liabilities. Likewise, the evidence reflected serious questions on whether Mr. Petros operates under an assumed name (John Seagaze) in business dealings, and the Court is loath to uncover a legitimate purpose for this bankruptcy if not simply to perpetuate the "shell game" the Debtor has been employing for years. While it is true that standing on their own, each one of these inconsistencies in the Debtor's disclosures would probably not establish cause for dismissal or conversion under section 1112(b) of the Bankruptcy Code, the sum total of all these inconsistencies, improbabilities and failures, especially coupled with the Debtor's failure to appear at the Hearing and provide testimony in response to questions raised as to the Debtor's good faith in this bankruptcy, come together to paint an indisputable picture of bad faith warranting relief under section 1112(b).

Similar, too, to the *Sal Caruso* and *Ozcelebi* cases is the fact that dismissal of the instant case would not be in the best interest of both the creditors and the estate. The Court finds, as the *Sal Caruso* court well summarized, that judicial and administrative oversight is ***essential*** to stem any further dissipation of assets by self-interested insiders to the further detriment of the bankruptcy estate and its creditors. The appointment of a Chapter 7 Trustee upon conversion would ensure prompt liquidation of the remaining assets, including the objective pursuit of pre- and post-petition transfers, pending claims and any true ownership of the real property at issue in this case. Accordingly, the Court will deny the Motion and order *sua sponte* that this case should be converted to Chapter 7 based in accordance with section 1112(b) of the Bankruptcy Code.

Based on the foregoing, it is hereby

**ORDERED** that the Motion to Dismiss is **DENIED** insofar as it requests dismissal of the Debtor's bankruptcy case; it is further

**ORDERED** that, for the reasons outlined above, the above-captioned Chapter 11 proceeding is hereby converted to Chapter 7; it is further

**ORDERED** that the United States Trustee shall appoint a Chapter 7 Trustee for this case as his earliest possible convenience; it is further

**ORDERED** that pending the appointment of a Chapter 7 trustee, the Debtor shall take no further actions or effect any further transfers with regard to any of the Inherited Properties or any other real or personal property that may even arguably be considered property of the estate, including with respect to any ownership interests in: (1) San Jacinto Operating Co.; (2) Johnson Grain Company; (3) Oro Montana S.A. Inc.; (4) Baxter Mountain Development Co; (5) Phoenix Gold Mining Corporation; (6) Johnson Realty Co.; (7) Tahoe Gold Mining and Refining Company; and (8) HTB Casino Holdings. Any proceeds from any of the foregoing shall be turned over to the duly appointed Chapter 7 trustee forthwith upon appointment.

**###END OF ORDER###**